PHELPS v. PHELPS

[109 N.C. App. 242 (1993)]

V

Defendant's remaining assignments have been abandoned. N.C.R. App. Pro. 28(b)(5).

VI

---

JON (JAKE) PHELPS, Plaintiff v. LISA B. PHELPS, Defendant

No. 9115DC1063

(Filed 2 March 1993)

**Divorce and Separation § 354 (NCI4th) — trial court's failure to take child's state of mind into consideration — age of father — award of custody to mother unsupported by evidence**

The trial court erred in awarding sole custody of the parties' child to defendant mother where the court allowed plaintiff father to testify concerning the child's state of mind but the trial judge indicated that she probably would not give this testimony any weight in determining the child's best interests; the trial judge concluded that you "can't talk to five year olds"; and it was apparent that the twenty-two year age

difference between plaintiff and defendant was one of the fundamental bases for the trial court's custody award.

.     **Am Jur 2d, Divorce and Separation §§ 974, 984; Infants §§ 42, 44.**

Appeal by plaintiff from order entered 30 April 1991 in Orange County District Court by Judge Patricia S. Hunt. Heard in the Court of Appeals 18 November 1992.

Jake and Lisa Phelps were married on 9 September 1984. On 26 May 1986, Lisa gave birth to their son, Joshua. On 9 September 1988, the couple separated and cared for their son under a shared custody arrangement consented to by the parties. On 5 September 1989, the plaintiff filed a verified complaint which sought joint legal custody of their minor son. On 30 April 1991, Judge Hunt filed a child custody and support order placing Joshua in the sole custody of his mother, the party defendant. The order also set out plaintiff's visitation rights, laid out certain parameters of conduct for the parties and ordered plaintiff to pay child support in the amount of $702.00 a month from April through August of 1991 and $468.00 per month thereafter. Plaintiff filed notice of appeal on 10 May 1991.

*James T. Bryan III for plaintiff-appellant.*

*Glenn, Mills & Fisher, P.A., by William S. Mills, for defendant-appellee.*

WELLS, Judge.

This case dramatically illustrates the frustrating and difficult aspects of our adversarial method of determining child custody between separated or divorced parents.

Joshua Phelps' parents separated when he was two years old. For approximately two years following separation, Joshua was "shared" by his parents, spending alternate weeks with each parent. When this action was initiated, Joshua was three, and when the case came to trial, he was five. He will be seven years old on 26 May 1993.

The trial of this case lasted for six days. Plaintiff entered sixty-one assignments of error to the trial court's order, and filed a thirty-five page brief with an extensive appendix. These materials

reflect (1) that plaintiff is profoundly dissatisfied with the trial court's conduct of the trial and the resulting order; (2) defendant is convinced that the trial was fair and that the resulting order was just and correct; and (3) that these parents are profoundly antagonistic with each other as to this only child's education, religious training, general lifestyle, and the influence of each parent on Joshua during his formative years. Ironically, the record also reflects that both parents are well educated and financially secure, both parents being employed in responsible positions at Duke University. Just as ironically, the trial court found both parents to be loving and concerned for Joshua's welfare and both fit to have custody. However, for reasons which we cannot agree were valid, the trial court found and concluded that it was in Joshua's best interest that sole custody be awarded to defendant.

At the trial, each parent, by varied and diverse evidence, attempted to establish that he/she was better able and suited to have custody of Joshua, and, consistently with our adversarial system, attempted to emphasize the character and personality flaws of the other, including "bad" influence on Joshua. Joshua was not called as a witness, which brings us to one of the assignments of error aimed at what plaintiff contends was an erroneous ruling on the admission of crucial evidence. Although, as we have noted, Joshua was not called as a witness, the trial transcript makes it clear that plaintiff wanted to get across to the trial court that some of defendant's conduct, particularly comments by her to Joshua about his father, were having an unwholesome effect on Joshua, perhaps to the point of emotional disturbance. In this context, the following events transpired. Plaintiff's counsel put the following questions to plaintiff: "Jake, just tell the court what kind of relationship do you have with Joshua. Let me strike that your Honor. Just tell us about Joshua." Then plaintiff proceeded to describe Joshua, the child and the person, in extensive glowing terms, closing with this comment: "I don't want to go on too long for the Court . . . but I can talk about Joshua forever." The testimony continued:

Q. Let me ask you about some things you did say.

THE COURT: He can describe his concerns but I don't think he can tell me what Joshua said. . . .

MR. BRYAN: They're based on—

PHELPS v. PHELPS

[109 N.C. App. 242 (1993)]

THE COURT: (Interposing) What he said. All right.

A. I am concerned—

MR. MILLS: (Interposing) Wait.

MR. BRYAN: I'm sorry.

THE COURT: That's fine.

A. Thank you, Your Honor. I am concerned about what he is concerned about. I am concerned that he seems troubled by interactions with his mother at times, often. I am concerned that he doesn't know how to treat them, and that I am caught between trying to reassure him that there is nothing wrong with his feeling troubled at the same time that I'm trying to nourish his positive relationship with his mother. It's a very difficult thing to do. It puts him in a position of not wanting to argue with me about how good he should feel towards his mother but he can't feel it and it's obvious and makes it a very hard thing and will keep me up at night even after he is able to go to sleep.

Q. Let me start, Jake, with how you handle these times when these things come up from Joshua.

A. I try to talk to him about the fact that we all have disagreements. I try to generalize to keep him from focusing in a negative way on his mother. I try to talk about—I try to divert him to something that's positive that happened in the same general area of activity or in the same general time period.

May I elaborate a little more? There is something that's deeper than that too. For example, when he finished talking to her about three Sundays ago and there were two witnesses there who saw this, he got off the phone and began to beat his big bear with a mallet in the left eye and said he was trying to get his eye out. And we were trying to talk to him about it and he was very upset after this conversation with Lisa and then he said it was because Lisa told him.—

MR. MILLS: (Interposing) Objection.

THE COURT: Sustained.

PHELPS v. PHELPS

[109 N.C. App. 242 (1993)]

MR. BRYAN: Okay. Your Honor, we offer it not for the truth of the matter.

MR. MILLS: Your Honor, that's exactly why he's offering it. He's offering it for the truth of the matter, Your Honor.

Counsel then argued extensively about whether Joshua's statements to his father should be admissible under exceptions to the hearsay rule, plaintiff arguing generally that they should be admitted to show Joshua's "state of mind," *citing and relying upon* this Court's opinion in *Griffin v. Griffin*, 81 N.C. App. 665, 344 S.E.2d 828 (1986). At the close of arguments, the court made the following ruling:

THE COURT: Well, it's always been a huge problem especially with small children in any kind of custody case and when they get a little bit older, you can talk to them. But you can't talk to five year olds and I don't think it's proper to put them on the stand and cross examine them. And that's where the problem is that we would have to rely on what he has to say in a hotly contested custody case that he says the child says about his mother. And, you know, that goes to the weight of the evidence, that's clear. But, you know, it's Judge Becton's ruling. . . .

I have for some time believed 803 probably would lead me—allow some of the testimony of children in, and I think, on some of the sex abuse cases that we're seeing makes it very clear that the Supreme Court is leaning too in that direction.

I am going to allow him to say, realizing that I probably am opening a keg of worms, and I will strike it immediately if it does not rise to what I believe is implicit in Rule 803, especially those first three. It is a dangerous thing and I want Ms. Phelps to understand and Mr. Phelps too, it is a dangerous thing for judges to listen to what children—what you're quoting children as saying. Number one, you hear what you want to hear. I am now six times a grandmother, four times a mother, you hear what you want to hear. I listen to juvenile cases all the time, I've heard God knows how many custody cases, and it's rare to hear the same words spoken by one child, the same for both parents.

You may proceed.

Following this ruling, plaintiff was allowed to tell the Court in extensive terms about incidents between Joshua and his mother, which tended to reflect poor judgment on defendant's part, and that defendant was having an unwholesome and disturbing effect on Joshua's emotions and emotional well-being. Plaintiff now complains that the trial court erred in not allowing responses of a like kind to two other queries about Joshua's "state of mind." Without detailing these queries, our concern is that Judge Hunt, while allowing some of this type of testimony, and excluding some, had earlier indicated that she probably would not give this testimony any weight in weighing Joshua's best interest. This is a far cry from what transpired in *Griffin*. To broadly conclude that you "can't talk to five year olds" flies in the face of common experience, common sense, and reasoned judgment, especially in a custody case.

In another argument, plaintiff contends that the trial court incorrectly and unlawfully denied plaintiff custody because of his age. Although the trial court's order makes no finding or conclusion as to the respective age of plaintiff and defendant (fifty-five and thirty-three), during her wind up of the trial, the court made the following statement:

> One of the reasons, Mr. Phelps, I had to look at, there is just no way — as my eye doctor told me the other day, you know, time is working on your eye, lady. He didn't say age. He said time. But I think you have to take that into consideration. This is a young child, and you are not a young man, and I think that it is important that this child be raised in one home. And that that home has to be the one that is apparently going to last the longest.

We cannot ignore the invalid and unfortunate implications of the court's comments, and it appearing that age difference was one of the fundamental bases for the trial court's custody award, we cannot condone this reasoning. It, of course, must not be assumed in any case that fathers who are or were married to younger mothers should be considered disqualified, for that reason, from having custody of their child or children. There is no acceptable basis in law or reason for awarding custody simply to the youngest parent or party in a custody action.

Plaintiff has raised questions about evidentiary support for other findings and conclusions of the trial court. While we discern

merit in these arguments, we decline to embellish upon them because they are not determinative of our decision.

In this case, as in all other custody cases, the trial court's discretion is to be accorded great deference. *See, e.g. In re Peal*, 305 N.C. 640, 290 S.E.2d 664 (1982). This record reflects lapses in judgment which require a new trial. From our review of the transcript, we cannot say that plaintiff was undeserving of the custody of his son, and while we may agree that Joshua, now of school age, will be better served, for example, by having primary residence in one home and going to one school, we cannot agree that Joshua's best interest has been acceptably determined below.

For the reasons stated, there must be a

New Trial.

Judges EAGLES and LEWIS concur.